## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL NELSON, | ) | |
| | ) | No. 18 CV 2839 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| SHERIFF JOHN IDLEBURG, *et al.*, | ) | |
| | ) | April 29, 2020 |
| Defendants. | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Michael Nelson, who is proceeding *pro se*,[1] a former deputy sheriff at the Lake County Sheriff's Office, is suing Defendants Sheriff John Idleburg and Lake County (together the "LCSO") and his former supervisor Sergeant James McKinney, alleging employment discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101. Defendants move for summary judgment on all claims. (R. 61.) For the following reasons, the motion is granted:

### Rules Governing Summary Judgment Motions

The court first addresses Defendants' arguments that the court should deem all of their facts admitted and ignore Nelson's statement of facts because he failed to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1. The Seventh Circuit has repeatedly held that a district court has broad discretion to require

---

[1] Nelson was represented by attorneys when he filed this action in April 2018, but they subsequently withdrew from this case in June 2019. (R. 56.) The court allowed Nelson time to retain new counsel, (id.; R. 67), but he never did.

strict compliance with Local Rule 56.1, *see Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009), even where, as here, the party opposing summary judgment is *pro se*, *see, e.g.*, *Greer v. Bd. of Educ. of the City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001).  That said, Nelson's *pro se* status affords him some leeway, although the court is not "obligated . . . to scour the record looking for factual disputes" on his behalf.  *Greer*, 267 F.3d at 727 (internal quotations and citation omitted).

Defendants served Nelson with a notice informing him of his Local Rule 56.1 obligations, (R. 65), but Nelson only filed a "Statement of Material Facts as to Which There is a Dispute" and supporting documents along with his 31-page response brief.  (R. 70; R. 71; R. 72.)  He did not file a separate response to Defendants' facts admitting or denying them.  As such, Defendants argue that the court should deem all of their facts admitted.  (R. 73, Defs.' Reply at 2); *see* L.R. 56.1(b)(3)(C) ("All material facts set forth in the [movant's] statement . . . will be deemed admitted unless controverted by the statement of the opposing party."). The court agrees that because Nelson failed to respond to Defendants' statement of facts despite having notice of this requirement, Defendants' factual assertions are deemed admitted to the extent that they are adequately supported by admissible evidence.  *See* L.R. 56.1(b)(3)(C); *see also Keeton v. Morningstar, Inc.,* 667 F.3d 877, 880 (7th Cir. 2012).

Defendants also argue that the court should "not consider most of the facts" in Nelson's statement of facts because he failed to support them and comply with

Local Rule 56.1's formatting requirements. (R. 73, Defs.' Reply at 3.) As Defendants correctly observe, the record evidence to which paragraph 3 of Nelson's statement of facts cites is not supportive of the assertions therein, and paragraphs 12, 29, and 34 through 38 do not include any citation to record evidence to support them. The court therefore disregards these paragraphs for purposes of ruling on Defendants' motion. (R. 74, Defs.' Fact Resp. ¶¶ 3, 12, 29, 34-38); *see Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015) (holding that district court did not abuse its discretion in disregarding parts of non-movant's statement of additional facts not supported by citations to the record).

Additionally, there are numerous paragraphs (1, 2, 4, 5-8, 10, 11, 13, 15, 16, 18, 19, 21-25, 27, and 33) in Nelson's statement with multiple factual statements, some of which are not properly supported by citations to the record. Given Nelson's *pro se* status, the court does not disregard entire paragraphs merely because Nelson did not adhere to the local rule's formatting requirements. Instead, the court considers only the facts in these paragraphs that are adequately supported by the record. Likewise, the court disregards those facts embedded in Nelson's response brief that are not adequately supported by the record. *See Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 972 (N.D. Ill. 2014) ("The discussion of facts in a responsive memorandum is insufficient to put the issue before the court.").

**Facts**

Having determined the facts the court can properly consider under Local Rule 56.1, the court views the following fact in the light most favorable to Nelson.

*See Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017). Nelson, who is African American, was employed by the LCSO as a deputy sheriff for nearly a decade, from March 21, 2008, through January 16, 2018. (R. 47, Second Am. Compl. ¶¶ 11-12.) From September 25, 2012, through August 22, 2017, Nelson was assigned to the LCSO's Warrants Division ("the Division"). (R. 64-3 (Nelson Dep. Tr.) at 15; R. 71, Pl.'s Facts ¶ 33; R. 74, Defs' Fact Resp. ¶ 33.) The members of the Division operate as a team and are responsible for serving arrest warrants throughout Lake County, Illinois. (R. 72-13 (EEOC File) at 13 & 44.) McKinney became the supervisor of the Division in June 2016. (R. 64-12 (Elliot Aff.) at 48.) There are only a few African American sheriff deputies in the LCSO, (R. 71, Pl.'s Facts ¶ 9), and during the relevant timeframe Nelson was the only African American member in the Division, (R. 72-13 at 44-45). The LCSO has a non-discrimination and harassment policy, and Nelson was aware of this policy during his employment at the LCSO. (R. 64, Defs.' Facts ¶ 25; R. 64-3 at 111-13.)

## A.    Dog Catch Pole Incident

Nelson alleges that in June 2016 a fellow member in the Division assaulted him with a "noose-shaped pole" known as the "dog catch pole." (R. 47, Second Am. Compl. ¶ 14(a); R. 64, Defs.' Facts ¶¶ 26-27.) A dog catch pole is a pole with a loop of rope at the end used by deputies to restrain a dog as needed when executing a warrant. (R. 64, Defs.' Facts ¶ 28.) According to Nelson, while the Division members were at a target's house, Deputy Robert Briggs, who was standing 10 to 15 feet away from Nelson, gestured toward Nelson with the pole saying, "Here,

4

Michael." (Id. ¶ 29.) Another deputy saw the gesture and told Briggs to stop because "that doesn't look good." (Id. ¶ 30.) Nelson alleges that this incident occurred on June 22, 2016, but he did not report it to anyone at the LCSO until six months later, on December 28, 2016, because, he says, he feared retaliation. (Id. ¶¶ 27, 35-36.)

## B.    **On-Duty Car Accident**

On November 7, 2016, Nelson was involved in an on-duty car accident in which another driver turned in front of his squad car. (Id. ¶ 5.) Nelson was taken by ambulance from the accident scene to a local hospital, where he was treated and released with a note excusing him from work for three days. (Id. ¶¶ 7, 9-10.) According to Defendants, each time there is a serious crash involving a squad car the LCSO's practice is to download and review the data on the car's computer, known as the "black box." (Id. ¶ 12.) The data from Nelson's squad car shows that Nelson was traveling 46 miles per hour in a 30-mile-per-hour zone within seconds of the accident. (Id. ¶ 13.) Ten days after the accident Undersheriff Ray Rose issued Nelson a letter of reprimand, noting that while the other driver was at fault for making an improper turn, Nelson's excessive speed was a contributing factor in the accident. (Id. ¶ 14.)

After the accident, Nelson submitted a medical note restricting him from performing his regular duties. (Id. ¶ 15.) In response, the LCSO placed him on light duty with an 8:00 a.m. to 5:00 p.m. work schedule. (Id. ¶ 16; R. 71, Pl.'s Facts ¶ 5.) Following his light-duty assignment, Nelson requested that his work schedule

be changed back to his regular 6:00 a.m. to 2:00 p.m. work schedule. (R. 64, Defs.' Facts ¶ 16; R. 64-7 (Hare Dep. Tr.) at 18.) He also requested approval to work a second job coaching basketball. (R. 64, Defs.' Facts ¶ 18.) The LCSO denied both requests.

According to Defendants, LCSO policy provides that sheriff deputies on light duty performing administrative functions are assigned the schedule of others also performing administrative duties and are not approved for secondary employment. (Id. ¶¶ 17-20.) The LCSO issued its "Limited Duty/Family Medical Leave" policy on December 14, 2016, the same day Nelson submitted his request to work secondary employment and after he was told that he could not work his regular schedule. (R. 64-3 at 120, 122.) That policy states that: (1) "[l]imited duty schedules may vary from the employee's regular work schedule or hours and based on the current needs of the Sheriff's Office"; (2) "[e]mployees assigned to limited duty will normally work a 9 hour day, with a one hour unpaid meal break, equaling 8 paid work hours"; and (3) "[e]mployees assigned to limited duty shall not engage in secondary employment." (R. 72-13 at 26, 28.)

A previous version of the LCSO's Limited Duty/Family Medical Leave policy is not in the record, but Rose and Chief David Hare, who became Undersheriff in October 2017, testified that prior to December 14, 2016, the policy said that "employees assigned to limited duty shall not engage in secondary employment unless authorized by the division chief." (R. 64-6 (Rose Dep. Tr.) at 17-20; R. 64-7 at 21-26.) They could not point to language in the prior policy concerning light-duty

work schedules.  (Id.)  Hare testified that the LCSO denied Nelson's request to work 6:00 a.m. to 2:00 p.m. because it was moving to a standardized 8:00 a.m.-to-5:00 p.m. schedule for all employees assigned to light duty.  (R. 64-7 at 19-20.)

## C.    Internal EEO Complaint

On December 28, 2016, Nelson filed an internal EEO complaint alleging race discrimination.  (R. 64, Defs.' Facts ¶ 23.)  The LCSO's EEO Officer, Chief Jennifer Witherspoon, who is African American, investigated Nelson's complaint, which included the pole incident that took place six months earlier.  (Id.; R. 72-13 at 42.)  Nelson alleged in his complaint that he experienced general race discrimination by unnamed "now retired supervisors," and discriminatory treatment when he was not selected to be a member of the Tactical Response Team and when he reported to McKinney about other Division members subjecting minorities to disparaging treatment.  (Id.)  Nelson's complaint did not include any allegations that he faced race discrimination when he was reprimanded for the November 2016 car accident or when he was denied a modified light-duty schedule and approval to work secondary employment.  (Id.)

On January 25, 2017, while Nelson's internal EEO complaint was under investigation, McKinney directed Nelson not to attend a training session.  (R. 64, Defs.' Facts ¶ 43; R. 64-5 (McKinney Dep. Tr.) at 49.)  According to McKinney, if a deputy is on light duty the practice is that he or she is not sent to training, (R. 64, Defs.' Facts ¶ 44), but the LCSO does not have a written policy to this effect, (R. 64-5 at 49-50).

Witherspoon investigated Nelson's internal complaint concerning the pole incident with Jim Elliot, the Chief of the LCSO's Internal Affairs. (R. 64, Defs.' Facts ¶ 31; R. 71, Pl.'s Facts ¶ 23.) Together they interviewed the members of the Division from the relevant time period, but none of the members, except Nelson, recalled the pole incident. (R. 64, Defs.' Facts ¶ 34.) In a report dated February 19, 2017, Elliot summarized the findings of the joint investigation concluding that Nelson's allegations were unfounded. (R. 64-12 at 45-52.) In late February 2017, Witherspoon issued her official report also concluding that she could not substantiate any of Nelson's complaints, including the pole incident. (R. 64, Defs.' Facts ¶¶ 41-42.)

## D. Retaliation

Nelson asserts that after he filed his internal EEO complaint, McKinney pursued a campaign of retaliation and engaged in further discrimination against him that included the following incidents: (1) on January 18, 2017, McKinney made a comment that "someone needs to die," (R. 71, Pl.'s Facts ¶ 20); (2) on February 13, 2017, McKinney made a "gunshot" sound disguised as an "exhale," (id. ¶ 24), and then, weeks later, made the same gunshot sound again, (R. 64, Defs.' Facts ¶¶ 45, 48); (3) in late February 2017, on the same day that Nelson learned that Witherspoon could not substantiate his EEO complaint, McKinney ordered Nelson to join him to pose for a group photo for the LCSO's Facebook page, (id. ¶¶ 51, 57); and (4) because Nelson refused to comply with McKinney's order to pose for a photo, Rose issued Nelson a two-day suspension, which was later rescinded by agreement,

(id. ¶¶ 54, 59-60). McKinney testified that he became aware of Nelson's internal complaint sometime before January 18, 2017. (R. 64-5 at 55-56.)

## E. EEOC Complaint

In March 2017 Nelson went on medical leave after he had surgery to treat injuries he sustained in the November 2016 car accident. (R. 64, Defs.' Facts ¶ 61.) For the entirety of his medical leave, Nelson received Public Employee Disability Act ("PEDA") benefits, which is essentially his regular pay without deduction for benefit time such as sick leave. (Id. ¶ 63.) PEDA benefits are granted to certain public employees who are injured on the job and cannot return to full duty.

On August 22, 2017, while still on medical leave, Nelson filed a charge of race discrimination, harassment, and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (R. 71, Pl.'s Facts ¶ 31; R. 74, Defs.' Fact Resp. ¶ 31.) On or about the same day, the LCSO contacted Nelson to collect his firearm and advised him that he was being transferred to highway patrol. (R. 71, Pl.'s Facts ¶¶ 32-33.) According to Defendants, it was the LCSO's practice to collect firearms from deputies on extended leave and a number of other deputies were also transferred to highway patrol on the same day as Nelson. (R. 74, Defs.' Fact Resp. ¶¶ 32-33.)

## F. Termination

In September 2017, after he had been on medical leave for about six months, Nelson underwent an independent medical examination ("IME") in conjunction with his then-pending worker's compensation claim against Lake County. (R. 64, Defs.'

Facts ¶ 65.)  The physician who performed the IME determined that Nelson was able to return to full duty, but Nelson disputed this finding and solicited a note from his own physician restricting his capacity.  (Id. ¶¶ 66-67.)  The LCSO returned Nelson to temporary light duty effective September 22, 2017, but terminated his PEDA benefits.  (Id. ¶¶ 66, 68.)

The LCSO and Nelson met twice in the fall of 2017 to determine when he could return to full duty.  (Id. ¶ 69.)  When Nelson reported at the second meeting that he was unable to return to full duty and had no definite return date, the LCSO removed him from light duty.  (Id. ¶ 70.)  Nelson did not return to work after the second meeting, and instead went on what he characterizes as a "forced leave of absence" using his own accrued benefit time.  (R. 64-3 at 328.)  On December 27, 2017, Nelson met with the Lake County State's Attorney to report the race discrimination he says he experienced at the LCSO, including the June 2016 pole incident.  (R. 47, Second Am. Compl. ¶ 17.)  A few days later, when Nelson reported to the LCSO that he was still unable to return to full duty with no definite return to work date, the LCSO terminated his employment, effective January 16, 2018.  (R. 64, Defs.' Facts ¶ 71.)  Nelson filed a second charge with the EEOC on July 9, 2018, based on his termination.  (R. 47, Second Am. Compl. ¶ 30.)

## Analysis

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To defeat summary judgment, the nonmoving

party "may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing there is a genuine issue for trial.'" *See Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1112-13 (7th Cir. 2013) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)). While the court construes all factual disputes and draws all reasonable inferences in favor of the nonmoving party, *see Parker,* 845 F.3d at 814, it will not draw inferences that are supported only by speculation or conjecture, *see Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018). "[C]onclusory statements not grounded in specific facts are not enough to stave off summary judgment." *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (internal quotations and citations omitted).

Nelson alleges race discrimination, retaliation, and a hostile work environment based on race in violation of Section 1981, Title VII, and the IHRA.[2] Courts in the Seventh Circuit have historically analyzed race discrimination claims under the same standards for all three statutes. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *Hoosier*, 32 F. Supp. 3d at 975 (noting that "Title VII, Section 1981, and IHRA claims use the same standards"). But the Supreme Court recently held that a plaintiff alleging race discrimination in violation of Section 1981 must prove that race was the but-for cause of the alleged discrimination, *see Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, ___ S. Ct. ___, 2020 WL

---

[2]  Nelson brings his discrimination and retaliation claims under Section 1981 (Count I) against all Defendants and under Title VII and the IHRA (Counts II and III) against the LCSO.  (See R. 47, Second Am. Compl.)

1325816, at *7 (March 23, 2020), which is a higher burden than Title VII's motivating factor test, *see Boyd v. Ill. State Police*, 384 F.3d 888, 895 (7th Cir. 2004) (emphasizing that in the context of Title VII race discrimination "there is a difference between a motivating factor[] and a single factor that is the precipitating force" for an employment action). Therefore, to prevail on his Section 1981 race discrimination claim Nelson must show that his race was the but-for cause of the claimed adverse employment action.

## A.    Race Discrimination Claim

Turning first to Nelson's race claims under Title VII and the IHRA, to survive summary judgment Nelson must offer evidence that would allow a reasonable jury to find that the LCSO's adverse employment actions against him were motivated by his race. *See Ortiz*, 834 F.3d at 765 (clarifying that the standard to be applied to Title VII claims at this stage is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action"). The Seventh Circuit no longer endorses the use of "disparate methods" to analyze evidence of discrimination. *See LaRiviere v. Bd. of Tr. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). The court must consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

As an initial matter, the court notes that both parties cite the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as the main avenue the court should use to determine if a triable issue

exists, (see R. 63, Defs.' Mem. at 7; R. 70 Pl.'s Resp. at 11). That framework can be a useful tool for assessing circumstantial evidence in discrimination cases. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). However, despite invoking *McDonnell Douglas* neither party actually presents their arguments in the burden-shifting framework, which typically involves arguing why a plaintiff can or cannot make out a prima facie case, articulating the reason for any adverse action, and then analyzing whether there is evidence that the proffered reason is pretextual. *See LaRiviere*, 926 F.3d at 359. The closest they come to applying this framework is in the context of the third and fourth prongs of the prima facie case—adverse employment action and similarly situated employee.

To the extent Defendants argue that Nelson has not made out a prima facie case under the *McDonnell Douglas* standard, the court agrees that the only adverse employment action Nelson has identified is his termination. Nelson attempts to argue that his exclusion from training also amounts to an adverse action, but that incident does not represent a significant change in employment status. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). A denial of training can constitute an adverse employment action only if accompanied by loss of pay or benefits, demotion, or other indicators unique to the job. *See Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Nelson argues only that he would have personally benefitted from the training, (see R. 70, Pl.'s Resp. at 18), but his disappointment is not the kind of tangible job change that qualifies as a materially adverse employment action.

To the extent that the parties address the fourth prong of the prima facie case—whether another similarly situated employee was treated more favorably—Nelson's termination claim also fails at the initial stage. An employee is similarly situated if he or she is comparable to the plaintiff in "all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2004). Nelson points to one LCSO employee as a comparator for his termination claim—Maria Nava—who had "several surgeries" and was not terminated.[3] (R. 70, Pl.'s Resp. at 15.) But these tidbits of information offer no insight into whether Nava "had the same job description, was subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications." *See Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) (listing factors courts frequently consider in the similarly situated analysis). In fact, the only similarity between Nava and Nelson is that they both sustained on-the-job injuries. (See R. 64-7 at 53-54.) Without more information about the proposed comparator, no reasonable jury could find that Nelson's race made a difference in his termination. In short, under the *McDonnell Douglas* framework, Nelson's Title VII and IHRA race discrimination claims fail.

Even setting aside the requirements of the *McDonnell Douglas* framework and evaluating the record evidence as a whole, the court finds that the evidence

---

[3] In his response, Nelson proposes another comparator—a white employee who "did not have a work-related injury [but] was out of work for 14 months [and] also was not terminated." (See R. 70, Pl.'s Resp. at 15.) Nelson fails to offer any specifics about this employee. Therefore, the court did not consider this alleged comparator. *See Hoosier*, 32 F. Supp. 3d at 972.

would not permit a reasonable jury to "conclude that [Nelson] would have kept his job if he [were not African American], and everything else had remained the same." *Ortiz*, 834 F.3d at 764. Such evidence may include:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class receive systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

*Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014) (citing *Alexander*, 739 F.3d at 979)).

Nelson presents no evidence that the decision makers who were involved in the termination decision exhibited racially charged behavior or made discriminatory comments or even stray remarks to Nelson, or any other member of the protected class. Nelson says that Witherspoon—the EEO investigator—once heard that a former undersheriff at the LCSO had call her the "n" word behind her back. (R. 71, Pl.'s Facts ¶ 10.) Setting aside the hearsay nature of this evidence, that particular undersheriff retired from the LCSO in 2011, (see R. 74, Defs.' Fact Resp. ¶ 10), before Nelson even joined the Division, and there is no evidence from which a reasonable jury could infer that the decision makers in this case were influenced by any discriminatory animus that the former undersheriff harbored. *See Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) (noting that it may be possible to infer discrimination when "those who provide input into the decision[] express such [discriminatory] feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of"). To be sure, racially charged

15

epithets are never acceptable, in or out of the workplace, but without a "real link between the bigotry and an adverse employment action" they are not circumstantial evidence of discrimination. *Gorence v. Eagle Food Ctr., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

Similarly, Nelson says that Witherspoon testified at her deposition that two other African American employees came to her with discrimination complaints. (R. 71, Pl.'s Facts ¶ 11; R. 74, Defs.' Fact Resp. ¶ 11.) But this testimony is also unhelpful to Nelson because it is too tangential and lacks useful specifics about the complaints and how they relate to this case. Equally unavailing is McKinney's deposition testimony that he was named as a defendant in a previous lawsuit involving a Hispanic juvenile. (R. 71, Pl.'s Facts ¶ 26.) At best, this testimony is only "collateral to evidence of specific discrimination against [Nelson himself]." *Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014); *see also Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) (explaining that in cases alleging individual discrimination the court must look for evidence of intentional discrimination against the plaintiff as opposed to incidents of discrimination directed against others).

Additionally, Nelson claims that he was assigned to more dangerous tasks in the Division than his coworkers, (*see* R. 71, Pl.'s Facts ¶ 2), but presents no supporting evidence that this was actually the case, *see Porties v. Gen. Elec. Co.*, No. 02 CV 3995, 2004 WL 1151594, at *7 (N.D. Ill. April 28, 2004) (finding fatal to his claim African American plaintiff's failure to "identif[y] any specific examples,

which are supported by admissible evidence, to support [a] claim" that similarly situated employees outside of his protected class were treated more favorably). Nelson did not, for example, identify with any specificity the amount of time he spent serving warrants without a gun or a bulletproof vest compared to his coworkers. Such evidence could undermine McKinney's testimony that all Division members occasionally perform undercover duties without a bulletproof vest to lure suspects for arrest. (R. 64-5 at 17-18.) But here, Nelson offers only his suspicions.

Finally, Nelson cites a 2014 text message wherein his coworker expressed a belief that Nelson was being discriminated against because the Division Supervisor at the time (not McKinney) "said to leave when [Nelson] showed up." (R. 71, Pl.'s Facts ¶ 1; R. 72-10 (Simone Msg.) at 1.) Nelson's desired inference from this message—that he has experienced racial discrimination since he joined the Division in 2012, (see R. 71, Pl.'s Facts ¶ 1)—is not reasonable. *See Skiba*, 884 F.3d at 721-22 (noting that the court "make[s] only reasonable inferences, not every conceivable one"). Nelson himself responded to the text message saying that he believed the conduct may have been the result of him having a new hire with him, not race discrimination. (R. 72-10 at 2.) Ultimately, the proffered inference constitutes only speculation and "[s]peculation does not create a *genuine* issue of fact." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (emphasis in original); *see also Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) (explaining that "when the evidence provides for only speculation or guessing, summary judgment is appropriate").

Nor is there evidence that a similarly situated employee outside of Nelson's protected class was treated more favorably than he was. To the extent Nelson points to Maria Nava as a comparator, as explained above, he has not shown that she is similarly situated. Moreover, Defendants have submitted undisputed evidence that, as it did with Nelson, the LCSO terminated non-African American employees who were on light duty or medical leave "with no definite return to work date." (R. 64, Defs.' Facts ¶¶ 72-73; R. 64-11 (Peterson Aff.).) In short, there is no evidence that the LCSO treated any similarly situated non-African American employee more favorably than Nelson with regard to the termination decision, or any other employment decision that Nelson complains of in this case.

Nelson also fails to submit sufficient evidence to show that the LCSO's legitimate reasons for the alleged incidents of discrimination are pretextual. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (citing *Reeves v. Sanders Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000)). To show pretext, Nelson "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [LCSO's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the [LCSO] did not act for the asserted non-discriminatory reasons." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (internal quotations omitted). However, Nelson fails to point to any evidence from which a reasonable jury could find that the LCSO's stated reasons for terminating Nelson were dishonest.

Nelson does not allege that any of the other instances of alleged discrimination—aside from the training denial—are actionable on their own. But in keeping with the Seventh Circuit's admonition that the evidence must be assessed cumulatively, *see Ortiz*, 834 F.3d at 763, the court considers them to determine whether a reasonable jury could infer from them that Nelson's termination was discriminatory. Ultimately, the court concludes that a reasonable jury could not so infer. First, regarding the termination of Nelson's PEDA benefits and his subsequent removal from the temporary light-duty assignment, (see R. 64, Pl.'s Facts ¶¶ 61-63, 65-70), nothing in the record suggests that the LCSO's actions were motivated by his race. Instead, the undisputed evidence shows that the LCSO's decisions were based on the IME finding that Nelson was capable of returning to full duty and Nelson then reporting that he was still unable to return to full duty and had no definite return date. (Id. ¶¶ 66, 70.)

Next, with respect to the collection of Nelson's firearm, Nelson makes much of the fact that the LCSO did not contact him about his firearm until late August 2017, when he had been on medical leave for five months. (R. 71, Pl.'s Facts ¶ 32.) The record also reveals that his firearm was collected on the heels of Nelson filing his EEOC charge and simultaneously with his transfer from the Division to highway patrol. (Id. ¶¶ 31, 33.) The timing of these events casts some doubt on Hare's testimony that it is the LCSO's practice to collect weapons from deputies on extended leave. (R. 64-7 at 48-49.) But even assuming Hare's testimony is a pretext, or a lie, Nelson still has to show that it was meant to hide race

discrimination. *See St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515 (1993) ("But a reason cannot be proven to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)). There simply is no evidence in the record that Hare—the decision maker here—exhibited racial animus toward him or other African-American employees.

The same is true of the incidents following the November 2016 car accident. Nelson first argues that the LCSO's investigation into his accident was a sham because he was not notified about the downloading of his squad car's black box and because Rose, who issued the letter of reprimand to Nelson, testified at his deposition that he did not know who conducted the investigation. (R. 71, Pl.'s Facts ¶ 4.) But Nelson does not offer any evidence showing Rose's belief that Nelson's excessive speed contributed to the accident was so incredible as to allow a jury to conclude that Rose made it up. In fact, Nelson does not dispute the data showing him speeding at 46 miles per hour in a 30 miles-per-hour zone seconds before the accident. (R. 64, Defs.' Facts ¶ 13.) In the absence of evidence that Rose's belief is unreasonable or not based on fact, no reasonable jury could conclude that his reasons for issuing the letter of reprimand were pretextual. *See Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 516 (7th Cir. 1999) ("[T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held.").

Nelson further argues that the LCSO deviated from its own policy when it denied his requests for a modified light-duty schedule and to work secondary

employment. (R. 71, Pl.'s Facts ¶¶ 6-7.) As for Nelson's request for a modified work schedule, he fails to offer any evidence from which a reasonable juror could find that the LCSO was dishonest in seeking to standardize the work schedule for everyone assigned to light duty performing administrative duties. *See Simpson v. Beaver Dam Cmty. Hosp., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision.") (internal quotation and citation omitted). Likewise, the fact that light-duty work hours were not reduced to a written policy until December 14, 2016—the very day when Nelson asked for an approval to work a second job—without more, does not demonstrate pretext. *See Hill v. Potter*, 625 F.3d 998, 1004 (7th Cir. 2010 (noting "the mere fact that the Policy is undocumented does not entitle [the plaintiff] to present [his] case to a jury").

Regarding Nelson's request to work a second job, the record shows that at all relevant times the LCSO's policy prohibited employees from engaging in secondary employment while assigned to light duty. (Compare R. 64-6 at 17 (testifying to light-duty secondary employment policy before December 14, 2016) with R. 72-13 at 26 (light-duty secondary employment policy issued on December 14, 2016).) Under these circumstances, pretext cannot be reasonably inferred. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (holding that no reasonable jury could conclude that employer fired plaintiff under false pretenses when it followed its policy).

Finally, the fact that McKinney told Nelson not to attend a single training session cannot demonstrate pretext for race discrimination. (R. 64, Pl.'s Facts ¶ 43.) The court is not concerned with the sensibility of McKinney's decision. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (noting that court is not a "superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision"). Rather, the relevant inquiry is whether McKinney's explanation—that in his experience at the LCSO, deputies on light duty do not attend training sessions, (R. 64, Defs.' Facts ¶ 44)—is a lie to cover up discrimination. *See Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir. 1987) (noting that "[i]t is easy to confuse 'pretext for discrimination' with 'pretext' in the more common sense (meaning any fabricated explanation for an action)"). Given the lack of any contradictory evidence, the court is unable to infer that McKinney was lying about his reason. Based on this, and the evidence as a whole, no reasonable jury could conclude that the LCSO discriminated against Nelson on account of his race in violation of either Title VII or the IHRA.

Nelson's discrimination claim against all Defendants under Section 1981 is based upon the same set of facts as his race discrimination claims under Title VII and IHRA, and as already noted, Section 1981 requires a higher degree of causation. *See Comcast*, ___ S. Ct. ___, 2020 WL 1325816, at *7. Given that Nelson cannot succeed on his race claims under Title VII and IHRA, he cannot succeed on his race claim under the more stringent standard required for Section 1981.

**B.      Hostile Work Environment Claim**

Turning to Nelson's race-based hostile work environment claim, a hostile work environment exists when the workplace is "permeated with discriminatory ridicule, intimidation, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). To survive summary judgment, Nelson must show that: "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class []; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* Workplace conduct is not measured in isolation, so the court must consider "the entire context of the workplace" in evaluating Nelson's claim. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

Nelson argues that McKinney created a hostile work environment when McKinney said, "someone needs to die," made gunshot-like sounds on two occasions, and ordered Nelson to pose for a group photo for the LCSO's Facebook page. Defendants argue that the incidents involving McKinney, "individually[] and taken together as a whole," do not "com[e] anywhere close" to being severe or pervasive and were not based on Nelson's race. (R. 63, Defs.' Mem. at 12.) It is axiomatic that alleged harassment must be "'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005) (quoting *Luckie v. Ameritech Corp.*, 839 F.3d 708, 713 (7th Cir. 2004)); *see*

*also Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) ("Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, [he] must be able to attribute a racial 'character or purpose' to it."). Even then, race-based harassment is actionable only when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boss*, 816 F.3d at 920. The court must consider "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.*

Here, a reasonable jury could not find the existence of a racially hostile environment based on McKinney's conduct. First, Nelson fails to offer any evidence that McKinney's comment or the subsequent gunshot-like sounds had any racial undertones. In fact, there is no evidence that they were even directed at Nelson. Nelson testified that his back was turned to McKinney when he overheard McKinney say, "someone needs to die." (R. 64-3 at 291.) It is also undisputed that McKinney made that comment during a conversation with another LCSO employee and Nelson does not know what they were talking about. (R. 64, Defs.' Facts ¶ 49.) Similarly, Nelson testified that he overheard both gunshot-like sounds from a distance. (R. 64-3 at 235, 241.) In short, Nelson's speculation cannot support his claim that the comment and gunshot-like sounds were intended to be threats toward him. *See Skiba*, 884 F.3d at 721 (noting that a court's "favor toward the

nonmoving party does not extend to drawing inferences that are supported by only speculation") (quotations and citation omitted).

Likewise, the Facebook photo incident, even considered with the earlier comment and gunshot-like sounds, is insufficient to support a hostile work environment claim, again because Nelson has submitted no evidence connecting the incident to his race. Furthermore, it is undisputed that McKinney did not recommend or take any disciplinary action against Nelson for refusing to follow his directive to pose for a group photo. (R. 64, Defs.' Facts ¶¶ 58-59.) That Nelson may have felt humiliated by McKinney "yelling and screaming" at him when he refused to participate in the photo, (see R. 70, Pl.'s Resp. at 28), does not demonstrate that McKinney's conduct was motivated by Nelson's race. In short, this one-time episode of a supervisor's raised voice, which ultimately did not result in any change to Nelson's employment, is not sufficient to establish a hostile work environment. *See, e.g.*, *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) ("One threat and raised voices would not rise to the level of a hostile work environment.").

However, the pole incident raises a significant red flag. Nelson describes the dog catch pole as being noose-like and contends that when Briggs approached him in the manner he did it offended him. (R. 70, Pl.'s Resp. at 26.) Another deputy who witnessed Briggs' behavior told him to stop because "that doesn't look good." (R. 64, Defs' Facts ¶ 30.) Despite this evidence, Defendants argue that because the dog catch pole "is not something that in and of itself is racial," the incident "cannot

be objectively viewed as racial," and that Nelson himself did not "regard it as such." (R. 63, Defs.' Mem. at 11-12.)

The Seventh Circuit has repeatedly acknowledged that the noose has a "disturbing history and status as a symbol of racial terror," *see, e.g.*, *Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016), and the court recognizes "the very real, very significant fear that such symbols inspire in those to whom they are targeted," *see Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635 (7th Cir. 2009). In this case, the record shows that a reasonable observer of the dog catch pole could perceive it as a noose-like object. In his February 2017 report, for example, Elliott noted that the pole has "a noose type loop at the end." (R. 64-12 at 45.) Further, when Witherspoon and Elliot interviewed the members of the Division about the pole incident, all but one member described the dog catch pole as a noose. (See id. at 48-51.) As such, the court agrees that a reasonable jury could accept Nelson's perception that Briggs' conduct using the dog catch pole to taunt him was racial in nature.

To sustain a hostile work environment claim, this single incident must be subjectively and objectively severe enough that it altered the conditions of Nelson's employment. *See, e.g.*, *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). "In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (internal quotations omitted). The court "will not find a hostile work environment for mere offensive conduct that is

isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yancick*, 653 F.3d at 544.

Some courts have found that a single instance of a noose in the workplace is insufficient to establish a hostile work environment. *See, e.g., Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. Appx. 421, 433 (6th Cir. 2014) (finding isolated incident involving coworker forming a noose out of a telephone cord and gesturing to indicate a hanging was not sufficiently severe or pervasive to support claim of race-based hostile work environment); *Jimerson v. Garrett Aviation Serv., LLC*, Case No. H-09-0790, 2010 WL 5067692, at *4-*5 (S.D. Tex. Dec. 6, 2010) (concluding that co-worker's statement that nylon rope in the shape of a noose hanging from the rafters at the plaintiff's workplace was to "wrap around [his] neck," was an isolated incident insufficient to support a hostile work environment claim). The Seventh Circuit has declined to "lay down . . . firm rules for when a noose in the workplace is or is not severe enough to be actionable." *See Cole*, 838 F.3d at 897. However, given that the pole in this case was directed at Nelson in a way that could objectively be viewed as having threatening racial undertones, the single incident here perhaps could be viewed as severe enough to have created an actionable hostile work environment claim. But the court need not resolve that question because to get past summary judgment, Nelson must ultimately show that LCSO bears liability for the hostile environment, and Nelson falls far short on that aspect of the analysis. *See Cole*, 828 F.3d at 898 ("[W]hen a plaintiff claims that co-workers are responsible for the harassment, he must show that his employer has been negligent in either

discovering or remedying the harassment."). Nelson bears the burden at the summary judgment stage to identify sufficient evidence on all four elements of his hostile work environment claim. *Yancick*, 653 F.3d at 544 (citing *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010)). Despite his pro se status, Nelson's failure to do so here or develop any clear argument as to how he meets this element sinks his claim. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (noting plaintiff's "pro se status does not alleviate his burden on summary judgment").

This is not a case in which Briggs continued to subject Nelson to racial harassment and the LCSO failed to remedy the harassment in the workplace after it knew or should have known about it. Here, the alleged incident was isolated, and despite his reporting obligations under the LCSO policy Nelson did not ask anyone in management to address the situation. Indeed, Nelson did not promptly report the incident to anyone at the LCSO. (See R. 64, Defs.' Facts ¶ 35.) By the time Nelson complained, six months had gone by and he had not suffered any other harassing behavior at the hands of Briggs or others or experienced any changes to his workplace conditions. An employer cannot be held liable for a co-worker's racial harassment when a mechanism to report the harassment exists, but the victim fails to use it. *Yancick*, 653 F.3d at 549; *see also Vance*, 646 F.3d at 472 ("[A]n employer's liability for co-worker harassment is not triggered unless the employee notifies the employer about instances of racial harassment.").

Moreover, after Nelson complained about the pole incident the LCSO took prompt and appropriate steps in responding to his complaint. *See Cole*, 838 F.3d at 898 ("A prompt investigation is the first step toward a reasonable corrective action."). Witherspoon spoke with Nelson multiple times and shared her own notes with Nelson concerning this and the other incidents alleged in his complaint. (R. 64-8 at 33-34.) Because of the racial nature of the pole incident, she also involved the appropriate supervisory personnel—Elliot. (Id. at 36-37.) Together, they interviewed all the members of the Division, but none could corroborate that Briggs used the pole in the manner described by Nelson. (R. 64, Defs.' Facts ¶ 34.) Importantly, Briggs transferred out of the Division months before Nelson lodged his complaint, (see R. 64-12 at 50), making it improbable that Nelson would be subjected to additional harassing behavior. All of this leads the court to conclude that the undisputed evidence is sufficient to show that the LCSO took reasonable steps to investigate and respond to Nelson's complaint once it became aware of the pole incident. *See Porter*, 576 F.3d at 636 (directing courts to consider the employer's response "as a whole" in evaluating whether it "took appropriate steps to bring the harassment to an end"). Because "nothing in the record would allow a reasonable jury to conclude that the [LCSO] was negligent in failing to discover or remedy the alleged racially hostile environment," *see Yanick*, 653 F.3d at 550, Nelson's hostile environment claim does not survive summary judgment.

## C.     Retaliation Claim

Nelson alleges that many of the same incidents discussed above in connection with his race discrimination and hostile work environment claims were in retaliation for his protected activity of filing an internal EEO complaint and subsequent EEOC charges and reporting the alleged discriminatory conduct to the Lake County State's Attorney.[4]   To survive summary judgment on his retaliation claim, Nelson must show that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a but-for causal connection between the two events.  *See Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013), for causation standard).   Timing alone is insufficient to establish a causal connection for a claim of retaliation.   *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008).

According to Nelson's Second Amended Complaint, McKinney unlawfully retaliated against him for making an internal EEO complaint on December 28, 2016, by commenting "someone needs to die," making gunshot-like sounds, and ordering him to pose for a group Facebook photo.  Nelson also claims that the LCSO unlawfully retaliated against him for the internal EEO complaint and filing an EEOC charge on August 27, 2017, by excluding him from a training session, collecting his firearm while he was on medical leave, making him work longer days

---

[4]  The parties rely on their arguments regarding the race discrimination and hostile work environment claims to support their arguments regarding the retaliation claim, drawing no distinctions between the evidence supporting those claims and the retaliation claim.

with no breaks while on light duty, denying him the ability to work light duty while injured, and making him use his own accrued benefit time instead of being given PEDA benefits while on medical leave. He further claims that after he complained to the Lake County State's Attorney on December 27, 2017, the LCSO terminated him. Defendants' only argument here is that Nelson cannot show that these actions would not have been taken but-for his protected activity.

The court agrees with Defendants that Nelson has not offered evidence to show the requisite but-for cause between his complaints and the adverse actions he alleges. Nelson seems to rely solely on the timing of his protected activity as circumstantial evidence of retaliation, emphasizing, for example, that the alleged instances involving McKinney happened after the LCSO launched an investigation into Nelson's internal complaint and that the collection of his firearm and transfer to highway patrol occurred simultaneously with the filing of his first EEOC charge. (R. 71, Pl.'s Facts ¶¶ 20, 24, 31-33.) Notably, there is no evidence tending to show that the LCSO was even aware of Nelson's EEOC charge at the time of the firearm collection or the transfer. "The mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (internal citation omitted). Nelson has not pointed to such evidence in the record in response to Defendants' motion.

Moreover, the LCSO presented legitimate, non-discriminatory reasons for its employment actions and, as explained above, Nelson has not demonstrated that these reasons were pretextual. *See Burton*, 851 F.3d at 698 (affirming summary judgment where the record contained a factual basis for each of the alleged actions and plaintiff failed to present sufficient evidence of pretext). Nor has Nelson identified any similarly situated employees to permit an inference of retaliation. *Id.* at 697. Instead, Nelson simply asserts that there "are no other reasons that are plausible to any of the actions taken against [him] other [than] it being for his race complaints." (R. 70, Pl.'s Resp. at 31.) Such sweeping conclusory assertions are insufficient to establish the required causal link. *See Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) (noting "[c]ausality is typically one of the highest hurdles relation plaintiffs must clear"). Because there is insufficient evidence from which a reasonable jury could infer that Nelson's statutory protected activities precipitated the actions he complains of, Defendants are entitled to summary judgment with respect to his retaliation claim.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.

ENTER:

_____

Young B. Kim
United States Magistrate Judge